```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
SARA CORPORATION,                   :    05 Civ. 2944 (JCF)
                                    :
            Plaintiff,              :        OPINION
                                    :       AND ORDER
      - against -                   :
                                    :
SAINTY INTERNATIONAL AMERICA INC.,  :
                                    :
            Defendant.              :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

Contract law is sometimes a blunt instrument for dealing with commercial realities: it displaces the flexible resolution of economic disputes with more rigid rules concerning burden of proof and the assignment of liability. Nevertheless, where a commercial relationship has broken down, as in this case, the parties necessarily fall back on the law of contracts.

This action arises out of three transactions between Sara Corporation ("Sara"), a garment manufacturer based in Pakistan, and Sainty International America Inc. ("Sainty"), an importer of apparel. The parties consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c), and a bench trial was held on January 14, 15, and 16, 2008. This opinion constitutes my findings of fact and conclusions of law as provided for by Rule 52(a) of the Federal Rules of Civil Procedure.

Background

A. The 2004 Loungewear Contract

In early 2004, Muhammad Azam, the President and Chief Executive Officer of Sara, and Michael Toms, who was then the Vice President of Sales for Sainty, commenced a series of communications concerning a program whereby Sara would manufacture and sell loungewear to Sainty for resale to Sainty's customer, Saks, Inc. ("Saks"). By February 2004, the parties had agreed that Sainty would purchase approximately 150,000 pieces, which Sara was to ship in six lots beginning in May and monthly thereafter. The terms of the agreement are reflected in e-mail communications between the parties (Pl. Exhs. 1, 2), in a series of purchase orders (Pl. Exhs. 3a-3h), and in a letter of credit issued to Sainty by HSBC Bank on April 2, 2004. (Pl. Exh. 10). According to the purchase orders, delivery was to be made "x-port of departure" on the first day of each month beginning May 1, 2004 (Pl. Exhs. 3a-3h), and the letter of credit provided that the shipments would be "FOB Karachi." (Pl. Exh. 10, fourth page).

The first three lots were shipped close to the dates specified in the purchase orders. (Tr. at 44-45, 50). The fourth installment, however, was three weeks late. Sainty accepted the goods and paid Sara for them, even though Saks demanded and received a discount from Sainty of $39,778.14 due to the late delivery. (Tr. at 50-51, 417-21; Def. Exh. E, first page). Then,

on August 18, 2004, Sara's staff apparently sent Sainty an e-mail warning that the lot due to be shipped on September 1 would be delayed. (Pl. Exh. 4). However, Mr. Toms never saw that communication. (Pl. Exhs. 4, 5). This fifth installment consisted of both flannel goods, as reflected in Purchase Order No. 40704-5 (Pl. Exh. 3e), and boxed set knitwear, as reflected in Purchase Order No. 40904-2 (Pl. Exh. 3h). On September 16, Sara sent another e-mail, indicating that the fifth lot would not be ready for shipment until September 24 and offering Sainty two options: the goods could be shipped aboard a vessel called the Nilgai that had a "cutoff" date of September 25, an estimated departure date from Karachi of September 30, and an estimated arrival date in New York of October 23 or, alternatively, they could be shipped on the Maersk Arizona, with a cutoff date of September 24, a departure date of September 25, and an arrival date of October 17. (Pl. Exh. 4). In response, Mr. Toms expressed frustration with the delay, but chose the second shipment option. (Pl. Exh. 5).

Sara delivered the goods to its customs broker in Karachi on September 23, 2004. (Tr. at 68). On September 28, a portion of the goods were loaded onto the Arizona in Port Qasim, Pakistan (Pl. Exh. 6), while the balance were loaded aboard another Maersk vessel, the Oranje, on September 30. (Pl. Exh. 7).[1]  Both vessels

---

[1] These dates are referred to in the bills of lading as the dates when the goods were "shipped on board." See American Dornier Machinery Corp. v. MSC Gina, No. 96 Civ. 9391, 2001 WL 1246589, at

apparently sailed to Salalah, Oman, where, on October 4, their cargo was transferred to the Maersk Georgia. (Pl. Exh. 8; Tr. at 70-73). The Georgia then proceeded to New York and discharged its cargo on October 24. (Pl. Exh. 8; Tr. at 354).

Correspondence ensued between Mr. Azam and Mr. Toms concerning the disposition of the goods. Because of the late arrival of the shipment, Saks cancelled its order with Sainty for the flannel goods, and Sainty in turn refused to take delivery of them at the port. (Def. Exhs. A, J; Tr. at 389-91). Sara ultimately transported these goods back to Pakistan at its own expense and, after removing proprietary trademarks, was able to sell a portion of them. (Tr. at 210-12). Sainty accepted delivery of the boxed set knitwear after the parties negotiated a discount of approximately $24,000. (Def. Exh. A).

In its First Cause of Action, Sara asserts a claim of breach of contract for Sainty's refusal to accept the flannel goods contained in the fifth installment. It seeks the contract price of $135,811.84 (Pl. Exh. 3e), together with shipping and reimport duties of $20,781.25 (Pl. Exh. 27) and demurrage and other charges of $31,791.50 that were incurred while the goods languished in New York Harbor (Pl. Exh. 26), minus a net recovery of $80,000 on the goods that were resold. (Tr. at 211). This results in a claim in

---

*2 (S.D.N.Y. Oct. 18, 2001) (noting that "shipped on board" signifies date cargo was loaded on vessel).

the amount of $108,384.84.

Sainty asserts two counterclaims arising out of the loungewear contract. In its First Counterclaim, it seeks to recover $39,778.14, which is the discount that it was required to give Saks because of the lateness of the fourth installment. (Def. Exh. E). In the Second Counterclaim, Sainty seeks profits of $24,607.00 that it contends it would have realized on the flannel goods contained in the fifth lot that it rejected after Saks had cancelled its order for them. (Def. Exh. D; Tr. at 421-25).

B. The Magic Show Samples

In the summer of 2004, Sainty arranged for Sara to produce loungewear samples to be shown at the "Magic" apparel show in Las Vegas in the last week of August. To the extent that the prototypes were well received, the styles were to be manufactured and sold in bulk under the Henry Grethel label. (Tr. at 107-10). On July 2, 2004, after Sainty had sent Sara examples of the types of items requested, Mr. Toms sent an e-mail seeking pricing information so that he could redesign the models and decide on the fabrics to be used. (Pl. Exh. 11). On July 16, Mr. Azam responded with prices for each style based on full production. (Pl. Exh. 12; Tr. at 110-13). On August 7, Mr. Azam sent another message to Mr. Toms, raising two concerns. First, he warned that, with respect to those garments for which Sainty had revised the designs, it would be "next to impossible" to have them ready in time for the Magic

show.  (Pl. Exh. 13).  Second, he explained that, particularly in view of the revisions to the designs, the cost of producing the samples had multiplied, and Sainty should be cautious about proceeding unless it had production orders against which the costs of the samples could be offset.  He concluded by saying:

> I am here to safeguard your interest as well as your money and telling you all the facts that how huge investment (and time) will be involved for this development.  Please think twice and advise me your consent if you really want us to proceed for the development of these styles.

(Pl. Exh. 13).[2]  On August 10, Mr. Toms responded:

> I need to have all that is humanly possible for magic show in samples!  I understand that cost will be an issue but, these specialized items are the impact of the presentation . . . they are urgently needed, please proceed with all speed.  As a company, we have signed a contract for this project for at least 3 years, all things will be worked out and our success depends on not looking ordinary or the same as other lines.

(Pl. Exh. 13).  That same day, having been reassured by Mr. Azam that the deadline could be met, Mr. Toms sent an e-mail that began, "Dear Great Azzzzz, If anyone can walk in space, it should be you!" and that went on to discuss the logistics of sending the samples. (Pl. Exh. 14).  Ultimately, most of the prototypes arrived in Las Vegas in time for the show.  (Tr. at 115).

Sara prepared an invoice for the samples dated August 26, 2004, reflecting a total cost of $29,610.00.  (Pl. Exh. 15).

---

[2] Many of the participants in these transactions are not native English speakers.  I have quoted their communications without correcting the syntax.

However, Sainty represented that it did not receive that document until at least November. (Tr. at 147-48, 150). In any event, Mr. Azam did not press for payment immediately because he anticipated that Sara would produce Henry Grethel products for Sainty in the spring and would be able to offset some of the cost of the samples. (Tr. at 219-20). As will be discussed below, this did not come to pass; accordingly, Sara now asserts a claim for the full invoice price of the samples.

C. The Henry Grethel Spring 2005 Program

In late 2004 and early 2005, Mr. Azam and Mr. Toms engaged in negotiations for Sara to produce loungewear for Sainty under the Henry Grethel label during the spring 2005 season. On December 3, 2004, Mr. Toms sent an e-mail to Mr. Azam with the subject heading "Spring 2005 HG Loungewear Order." It stated in part, "[B]elow is the initial Spring 2005 loungewear order; we hope to add to this additionally for later delivery. Per my conversation with Allen,[3] as agreed, per orders placed, we don't expect any sample charges." (Pl. Exh. 16). There followed a list of styles, with quantities, prices, colors, and fabrics indicated for each. A shipping date of "1/15/04 [sic] x-port Karachi" was designated.[4] The e-mail further noted that "[a]ll label, hangtag, embroidery, size scales, packing

_____

[3] Allen Liu is the Senior Vice President of Sainty.

[4] This was a typographical error, as Mr. Toms intended to indicate a delivery date of January 15, 2005. (Tr. at 119-20).

info" would be sent the same day and that "[o]nce all is confirmed, we will work on L/C," referring to a letter of credit. (Pl. Exh. 16). On December 30, Mr. Toms sent another e-mail to an employee of Sara named Mairaj, indicating that he had received and approved specifications for the Henry Grethel styles. Accordingly, he directed Mairaj to "Please move forward with Sp 05 production, for earliest possible delivery. Mr. Allen Lui [sic] is expected back from China next week, L/C and PO will be sent then." (Pl. Exh. 17).

Mairaj, along with another Sara employee named Kamal, sent an e-mail to Mr. Toms on January 4, 2005 indicating that they had "worked out the possibility of getting the fabric on the earliest possible time frame but the supplier is still insisting that he can not complete the delivery of the fabric before 2/25." (Pl. Exh. 21). The e-mail also said, "Please note that as advised to you by me earlier that as long as you keep giving us the orders (at least 300 dz each combo) for all the development we are making there won't be no sampling charges. . . . However, we are still waiting for the balance order for Henry Grethel - Please advise." (Pl. Exh. 21).

Mr. Toms responded the next day, expressing concern about the delivery date. He said, "Please try to let me now understand that - you will only get the fabric at the earliest 2/25/05, and based on our needed qtys, what do you expect the actual production of

garments to be . . . x-factory?" (Pl. Exh. 21).  With respect to

sample costs, he asked whether "this situation will be closed as to

the $29,610.00" if Sainty ordered 300 dozen of each of the Henry

Grethel items.  (Pl. Exh. 21).

On January 6, 2005, Mr. Toms sent Mr. Azam another e-mail with

the heading "Spring 05 Production Order vs. Spring 05 Sample

Invoices."  (Pl. Exh. 18).  In it, he itemized styles and

quantities for the spring 2005 program.  He stated, "The below

outlined order for Spring 05, is what we want to place, it totals

$67,140.00 USD.  If this is placed by L/C within the next couple of

days, 'What is our balance due (in dollars) on the Spring 05 sample

invoices totaling $29,610.00 USD?'" (Pl. Exh. 18).

Apparently, Mr. Liu sent an e-mail to Mr. Azam on or about

January 11, seeking further information with respect to the sample

costs.  On January 13, Mr. Toms followed up with an e-mail that

stated:

> It has been (2) days since Allen Lui [sic] has asked for
> clarification to your invoices on Sp05 Sampling of the HG
> product.  The lack of response has been taken as a
> refusal to address specific questions concerning your
> costing on invoices.  That said, I've been asked to
> terminate any and all development, projects and proposed
> production and communication for the future.

(Pl. Exh. 22).  Mr. Azam responded to Mr. Liu on January 15,

stating that he had just returned to Karachi and received Mr. Liu's

earlier e-mail.  He then provided an explanation for the magnitude

of the sample charges.  He closed by noting that Sara had begun

production for Sainty's spring deliveries and asking for a resolution of open issues. (Pl. Exh. 23).

On January 18, Mr. Toms sent an e-mail to Mairaj confirming receipt of several samples for the spring production. He noted that, to his knowledge, Sainty had not received Mr. Azam's response to Mr. Liu's questions concerning the invoices for the Magic show samples. Nevertheless, he assured that "[a]s soon as these gentlemen clear issues, L/c will be opened." (Pl. Exh. 24). However, the project never got back on track, and this litigation ensued. In the Third Cause of Action, Sara seeks damages of $46,233.00 arising from the aborted spring 2005 program, consisting of $29,500.00 spent on raw materials (Pl. Exh. 25; Tr. at 239-40), $10,800.00 in labor costs (Tr. at 241-42), $3,300.00 in overhead (Tr. at 242-43), and lost profits of approximately $10,000.00 (Tr. at 243-44), minus $7,367.00 that was recovered through resale of some of the raw materials (Tr. at 244).

Additional facts will be discussed in connection with the legal analysis of each claim.

Discussion

     A. The Loungewear Agreement

To establish a claim for breach of contract under New York law,[5] there must be proof of "'(1) a contract; (2) performance of

---

[5] The parties' briefs assume that New York law governs this case. Such "'implied consent . . . is sufficient to establish choice of law.'" International Business Machine Corp. v. Liberty

the contract by one party; (3) breach by the other party; and (4) damages.'" _Terwilliger v. Terwilliger_, 206 F.3d 240, 245-46 (2d Cir. 2000) (quoting _First Investors Corp. v. Liberty Mutual Insurance Co._, 152 F.3d 162, 168 (2d Cir. 1998)); _see also Oldcastle Precast, Inc. v. United States Fidelity & Guaranty Co._, 458 F. Supp. 2d 131, 141 (S.D.N.Y. 2006). A contract may consist of multiple writings, construed together, if the parties so intend. _See_ _TVT Records v. Island Def Jam Music Group_, 412 F.3d 82, 89 (2d Cir. 2005). "Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'" _Id._ (quoting _This is Me, Inc. v. Taylor_, 157 F.3d 139, 143 (2d Cir. 1998) (alteration in original)).

### 1. The Plaintiff's Claim

The parties agree that they had a binding contract for Sara to manufacture loungewear and deliver it to Sainty in six monthly installments beginning on May 1, 2004. There is also no dispute that this contract was modified by the exchange of e-mails on September 16, 2004, in which Sara offered two options for shipping the fifth lot and Mr. Toms accepted one of them. (Plaintiff's Post Trial Memorandum of Law and Argument ("Pl. Memo.") at 12-13;

---

Mutual Insurance Co., 303 F.3d 419, 423 (2d Cir. 2002) (quoting Santalucia v. Sebright Transportation, Inc., 232 F.3d 293, 296 (2d Cir. 2000) (internal quotations omitted)).

(Defendant's Post Trial Reply Memorandum ("Def. Reply") at 1 & n.2). The parties disagree, however, as to the precise delivery terms and whether Sara complied with them.

According to Sainty, the delivery terms are reflected in the Letter of Credit (Pl. Exh. 10) and in the September 16 e-mail from Sara outlining the alternative available voyages (Pl. Exh. 4). Sainty contends that Sara failed to comply with the terms of the agreement because (1) the goods were not placed on board the vessel by the cut-off date of September 24 as set forth in the e-mail, (2) they were transported on a vessel different from that designated in the e-mail, (3) they were transferred to another vessel in Oman, in violation of the term in the Letter of Credit prohibiting transshipment, and (4) they arrived a week after the date identified in the e-mail. (Defendant's Post Trial Memorandum ("Def. Memo.") at 24-25).

Sainty's argument that it was entitled to reject the fifth installment because it was transshipped fails because that contention is based exclusively on the Letter of Credit.

> In its classic form, the letter of credit is only one of three distinct relationships between three different parties: (1) the underlying contract for the purchase and sale of goods between the buyer ("account party") and the seller ("beneficiary"), with payment to be made through a letter of credit to be issued by the buyer's bank in favor of the seller; (2) the application agreement between the bank and the buyer, describing the terms the issuer must incorporate into the credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3) the actual letter of credit which is the bank's irrevocable promise to pay the

seller-beneficiary when the latter presents certain documents (e.g., documents of title, transport and insurance documents, and commercial invoices) that conform with the terms of the credit.

The great utility of the letter of credit derives from the fact that these relationships are utterly independent of one another[.]

Alaska Textile Co. v. Chase Manhattan Bank, N.A., 982 F.2d 813, 815 (2d Cir. 1992) (internal citations omitted). "This 'independence principle' is most often expressed to distinguish actual letters of credit from the underlying contracts between buyers and sellers." Generale Bank v. Czarnikow-Rionda Sugar Trading, Inc., 47 F. Supp. 2d 477, 479 (S.D.N.Y. 1999); see also Success Universal Ltd. v. CWJ International Trading, Inc., No. 95 Civ. 10210, 1996 WL 535541, at *4 (S.D.N.Y. Sept. 20, 1996) ("The paramount principle in transactions involving letters of credit is the so-called 'independence principle,' in which letters of credit are completely independent of the underlying sales contract on which they are based.").

Consistent with these precepts, the court in Success Universal rejected a claim of breach of contract by a buyer who asserted that the seller had permitted transshipment in violation of the terms of the letter of credit:

Because nothing in the Contract of sale indicated a desire by plaintiffs not to have the goods transhipped, it was not unreasonable for the defendant to arrange shipment with a carrier that reserved the right to tranship. If plaintiffs had wished a prohibition against transhipment to be a term of the Contract of sale between themselves and the defendant, they could have bargained

13

for it.

1996 WL 535541, at *4. The same is true here: none of the negotiations between Sara and Sainty ever addressed the issue of transshipment, and no prohibition was included in any document reflecting the terms of sale. Thus, Sara's breach of contract claim is not foreclosed on this ground.

The validity of Sainty's remaining arguments hinges on the extent to which the parties modified the delivery terms contained in their original agreement by their subsequent communications. According to the initial contract, as reflected in the purchase orders, the fifth installment was to have been delivered "x-port of departure" by September 1, 2004. (Pl. Exhs. 3e, 3h). This was consistent with the language of the Letter of Credit, which designated delivery "FOB Karachi." (Pl. Exh. 10, fourth page). Sainty contends that the September 16 e-mail exchange altered these arrangements by requiring that the goods be loaded on the vessel by the delivery date, be transported only aboard the Maersk Arizona, and arrive in New York no later than October 17.

The evidence does not support Sainty's position. According to Sainty, as a result of the September 16 e-mail, "Sara's obligation to deliver the goods 'FOB port', (Karachi) essentially became 'FOB vessel' (Maersk Arizona)." (Def. Reply at 1 n.2). But, of course, no such language appears in the e-mail. Indeed, the dates of departure and the dates of arrival were characterized only as

estimates. There is no indication that the parties intended to modify the delivery terms as radically as Sainty suggests.

There is no doubt, however, that the contract was modified to change the delivery date to September 24. Therefore, in order to establish performance, Sara must prove that it delivered the fifth installment FOB Karachi by that date. It has failed to do so. "The general rule is that upon a sale 'f.o.b. the point of shipment,' title passes from the seller at the moment of delivery to the carrier, and the subject of the sale is thereafter at the buyer's risk." Standard Casing Co. v. California Casing Co., 233 N.Y. 413, 416 (1922) (citations omitted). Thus, "[o]rdinarily, delivery to the carrier is delivery to the buyer." Chase Manhattan Bank v. Nissho Pacific Corp., 22 A.D.2d 215, 221, 254 N.Y.S.2d 571, 577 (1st Dep't 1964). "[T]he seller must bear the risk and expense of putting the goods in the possession of an independent carrier at the seller's location." Pittsburgh Industrial Furnace Co. v. Universal Consolidated Cos., 789 F. Supp. 184, 188-89 (W.D. Pa. 1991) (construing UCC § 2-319(1)(a)).

At trial, Sara presented evidence only that it had conveyed the goods to its customs broker on September 23. (Tr. at 65, 68; Pl. Exh. 9).[6] As Sara's agent, the broker is not the same as the

---

[6] Plaintiff's Exhibit 9 is a Bill of Export that was admitted into evidence over the defendant's objection as a public record. On further reflection, that document does not qualify for the public records exception to the hearsay rule, Rule 803(8) of the Federal Rules of Evidence. At best, it may fall within the

carrier for purposes of delivery. Meanwhile, the bills of lading from Maersk show only that three containers were shipped on board the Arizona on September 28 and two more were shipped on board the Oranje on September 30. (Pl. Exhs. 6, 7). Thus, there is no evidence of when, between September 23 and September 30, all of the goods in the fifth installment were transferred to the custody of Maersk or its agents. Since Sara has not demonstrated that this was accomplished by September 24, it has failed to carry its burden of showing that it performed its obligations under the modified contract. Therefore, it cannot prevail on its First Cause of Action for breach of the 2004 loungewear contract.

### 2. The Defendant's Counterclaims

#### a. The Fourth Shipment

Sainty's First Counterclaim relates not to the fifth lot, which it rejected as untimely, but to the fourth shipment, which it accepted and paid for despite the fact that it was late. Sainty seeks damages equal to the amount that its payment from Saks was discounted because of the delay.

This claim has been waived. Where a tender of goods has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of

---

business records exception, Rule 803(6), but no custodian or other qualified witness provided the foundation necessary for its admission on that basis. In any event, given the limited information it contains and the legal analysis of this issue, its admission was harmless.

breach or be barred from any remedy." N.Y. UCC § 2-607(3)(a). The reasonableness of any delay in notifying the seller of a breach is generally a matter decided by the finder of fact, though some delays are unreasonable as a matter of law. See Atronic International, GmbH v. SAI Semispecialists of America, Inc., No. 03-CV-4892, 2006 WL 2654827, at *9 (E.D.N.Y. Sept. 15, 2006). For example, in Mount Vernon Mills, Inc. v. Murphy Textile Mills, 148 A.D.2d 389, 390, 539 N.Y.S.2d 334, 334 (1st Dep't 1989), the court found that a buyer had waived a claim for the late delivery of goods when that claim was raised seven months after delivery and then only in response to the seller's suit seeking payment.

Here, the fourth shipment, which was supposed to have been delivered on August 1, 2004, was turned over to the carrier on September 2 (Pl. Exh. 3d) and arrived in New York later that month. Yet, Sainty did not register a protest concerning this delay until it filed its Answer and Counterclaims in this case on May 25, 2005. This delay of some nine months is plainly unreasonable. The late delivery of the shipment is not a latent defect such that Sainty could be excused for failing to discover the breach in a timely manner. See Liberty Steel Products v. Franco Steel Corp., 57 F. Supp. 2d 459, 468-69 (N.D. Ohio 1999). Moreover, the parties engaged in a series of communications between September 2004 and January 2005 where any dispute over the fourth shipment could have been addressed.

Sainty contends that the dispute over the delivery date was in fact raised, as reflected in a series of e-mails between among Mr Toms, Mr. Liu, and Mr. Azam. (Def. Exh. A). I do not read those communications as relating to the fourth lot, however. In an e-mail dated November 3, 2004, Mr. Toms stated,

> Saks has already CANCELED the flannel, invoice # 078/SI/04-05 for Sainty PO# 40704-5. I am trying desperately, to save something for you . . . . We need you to combine both amounts of discount ($46,490.00 total) and apply it to invoice #080/SI/04-05 for Sainty PO# 40904-2 only. That's your entire discount amount to the invoice stated, for the "BOXED SETS". We need done by TODAY, otherwise Saks will CANCEL this BOXED SETS again . . . . which we don't wish to happen. As to invoice # 078/SI/04-05 for Sainty PO # 40704-5, we will try to consider what to do.

(Def. Exh. A, third page). The purchase orders referred to in this communication, which set the parameters for the subsequent e-mails, relate to goods that were exclusively part of the fifth shipment, not the fourth: Purchase Order No. 40904-2 covered boxed sets of knitwear, while Purchase Order No. 40704-5 covered flannel goods, all of which was originally scheduled for delivery on September 1, 2004.

Indeed, even if this series of communications related to the fourth shipment, Sainty's counterclaim would fail because it appears that the dispute was settled with respect to everything except the rejected flannel order which was part of the fifth shipment. On November 5, 2004, Mr. Liu wrote to Mr. Azam, stating,

> We're going accepted your offer of $24,093.42 discount on Boxed set and, released payment today, appreciated your

> cooperation to shared the lost with us. From this point,
> we know you are reasonable and willing to take
> responsibility as partner with us which, the partner we
> always looking for. However, for the late shipment of
> the Flannel pant, it is really out of my hand and we
> really cannot take those merchandise in.

(Def. Exh. A, second page). Accordingly, Sainty cannot recover on
its First Counterclaim.

### b. The Fifth Shipment

_____In its Second Counterclaim, Sainty seeks $24,607.00 which it
says it would have realized on the flannel goods from the fifth lot
that it rejected on the basis of late delivery. As discussed
above, the contract, as modified by the parties' e-mail
communications, required only that Sara deliver the goods FOB
Karachi by September 24, 2004; it did not mandate use of a
particular vessel or constitute a guarantee that the shipment would
arrive in New York by a specific date. Sainty can therefore
prevail on its counterclaim only if it can demonstrate that it
properly rejected the fifth shipment. But, just as Sara failed to
show that the goods were delivered on or before September 24, so
Sainty has failed to establish that they were not delivered until
after that date. There is simply no evidence of when the shipment
passed from Sara's customs broker to the possession of Maersk or
its agent. Thus, this counterclaim must also be denied.

### B. The Magic Show Samples

Sara next seeks damages equal to the $29,610.00 that it billed
Sainty for the samples that it manufactured for the Magic show.

Sainty contends that, in the absence of an agreement on price, there was no contract and that, in any event, the amount sought by Sara is unreasonable and unsupported by the evidence.

A contract may be binding even if no agreement has been reached on price. See Pulprint, Inc. v. Louisiana-Pacific Corp., 124 Misc.2d 728, 729-30, 477 N.Y.S.2d 540, 541-42 (Sup. Ct. N.Y. 1984). Under the Uniform Commercial Code, "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled." N.Y. UCC § 2-305(1). Here, Sara and Sainty plainly intended that Sara manufacture the samples for the Magic show. Indeed, knowing that no price had been agreed upon, and having been warned by Mr. Azam that the cost would be high, Sainty nevertheless pressed Sara to perform.

Where, as here, there is a contract in which the price term has been left open,

> the price is a reasonable price at the time of delivery if
>
>> (a) nothing is said as to price; or
>>
>> (b) the price is left to be agreed by the parties and they fail to agree; or
>>
>> (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and is not so set or recorded.

N.Y. UCC § 2-305(1). Thus, it is necessary to determine a

reasonable price for the samples.[7]

Sara argues that under UCC § 2-305(3), a party may fix the reasonable price, provided that it does so in good faith. (Pl. Memo. at 16). That is not the case. As one commentator has pointed out,

> The problem of setting a reasonable price is made more difficult by the fact that one of the parties to the open price contract often tries to set the open price unilaterally, as where the seller bills the buyer, or the buyer makes a remittance to the seller. Unless the contract gives the party so acting the power to set the open price term (Section 2-305(2)), such billings or remittances are evidence only of what the particular party thinks the price ought to be, but courts sometimes use these "prices" as the focal points around which to

---

[7] Sainty suggests that Sara should be barred from any recovery on this claim because the plaintiff alleged in the Complaint that the parties had agreed to a price of $29,610.00. (Def. Reply at 18-19; Compl., ¶ 12). Relying on Caribbean Wholesales & Service Corp. v. U.S. JVC Corp., 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997), Sainty argues that Sara cannot now change its theory by acknowledging that there was no agreement as to price and instead relying on UCC § 2-305 to fill the gap. This argument fails for two reasons. First, Caribbean Wholesales involved the attempt to inject into that litigation an entire claim "never addressed, or even hinted at, in the complaint," id., not merely to adopt an alternative theory closely related to a claim originally advanced. Second, in the Joint Pretrial Order, Sainty acknowledged the existence of a contract with an open price term. In the defendant's summary of the case, Sainty stated:

> Defendant alleges that . . . the parties . . . entered into an agreement whereby Plaintiff agreed to provide certain clothing samples relating to licensed Henry Grethel apparel in accord with accepted business and trade practices of the apparel industry. Defendant alleges that Plaintiff breached the foregoing agreement by charging an excessive and unreasonable amount for the Henry Grethel clothing samples.

(Joint Pretrial Order, § iii).

decide the question of a reasonable price, thus giving
them far more weight than they deserve.

1 Hawkland UCC Series § 2-305:3. Thus, "[i]n cases where a
mutually agreeable price cannot be established because one of the
parties refuses to cooperate, the court will fill the open price
term by supplying a reasonable price, as provided by subsection 2-
305(1)(b)." Id.

There is scant evidence here on which to base a reasonable
price for the samples. On July 22, 2004, Mr. Azam sent Mr. Toms an
e-mail in which he estimated that approximately 1,200 kg. of fabric
would be needed for all of the samples, and that the fabric would
cost between $6.00 and $8.00 per kilogram. (Def. Exh. H). At an
average of $7.00 per kilogram, this would result in a total cost of
$8,400.00. Consequently, Mr. Toms anticipated that Sainty would be
charged $10,000.00 or less for the samples. (Tr. at 447).

However, in an invoice dated August 26, 2004, Sara billed
Sainty for $29,610.00. (Pl. Exh. 15). This included charges for
1,596 kg. of fabric ranging in price from $8.00 to $18.00 per
kilogram, charges for screen development, washing charges, charges
for accessories, and charges for the development of patterns and of
mesh.[8] (Pl. Exh. 15). According to Mr. Azam, the divergence

_____

[8] Although the invoice for mesh development was for $1,500.00,
Mr. Azam later represented to Mr. Liu that only $300.00 was
actually attributable to this task and that the balance of
$1,200.00 was actually a payment, authorized by Mr. Toms, to
release the mesh from customs. (Pl. Exhs. 15, 23).

between his estimate and the ultimate bill was due to the fact that the final specifications for the samples required more expensive materials than originally anticipated. (Tr. at 220-21, 342-49). This is not entirely credible. Mr. Azam provided none of the bills for the raw materials to support his testimony, and there is evidence that Sara's charges were out of line with typical sample charges in the industry. (Tr. at 395-400). This discrepancy may be attributable to Mr. Azam using inflated costs as a lure to entice Sainty into contracting for the manufacture of more Henry Grethel goods against which those costs could be offset. (Pl. Exhs. 16, 19, 21; Def. Exhs. F, K, M).

A rough method of arriving at a reasonable price is to limit Sara to the $7.00 average fabric cost that it included in its original estimate. Based on 1,596 kg. of material, this results in charges of $11,172 for fabric. The costs for accessories and washing should be added, as should the cost of screen development, since that is a necessary expenditure that would only be recovered if bulk orders were placed later. While the $300 cost of mesh development is also valid, the $1,200.00 charge for customs fees that was surreptitiously included under that heading is not.[9] The allowable additional charges bring the total reasonable price of the samples to $14,692.00. This is not a precise analysis. Sara

_____

[9] If, in fact, there was a separate agreement that Sainty would pay for these charges, Sara never sued on it.

can fairly argue that some of the fabrics that Sainty specified cost more than the original $6.00-$8.00 estimate. (Tr. at 220-21; 342-49). On the other hand, Sainty can legitimately claim that Sara invoiced more than the necessary amount of fabric. (Tr. at 396-400; Pl. Exh. 23). At the end of the day, these factors are likely to balance out more or less, and $14,692.00 is a good estimate of a reasonable price based on the evidence presented.

In addition, a party found liable for breach of contract is also liable for prejudgment interest under New York Law. CPLR § 5001(a); see Graham v. James, 144 F.3d 229, 239 (2d Cir. 1998). That interest is calculated at the statutory rate of nine percent per year, compounded annually. CPLR § 5004; see Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 90 (2d Cir. 1998). Interest must be computed from "the earliest ascertainable date the cause of action existed." CPLR § 5001(b). Accordingly, Sara is entitled to an award of interest from August 26, 2004, the date it first invoiced Sainty for the Magic show samples.

C. The Spring 2005 Henry Grethel Program

Sara contends that the parties formed a binding contract for Sara to supply Sainty with Henry Grethel branded goods during the spring 2005 season. According to Sainty, however, the parties had merely developed "an outline of a project" but had not entered into an agreement when Sainty terminated its relationship with Sara in mid-January 2005. (Tr. at 118). On balance, the evidence supports

24

Sainty's position.

The legal principles governing this analysis are well established.

> "Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties. If there is no meeting of the minds on all essential terms, there is no contract. This is because an enforceable contract requires mutual assent to the essential terms and conditions thereof."

Opals on Ice Lingerie v. Bodylines, Inc., 320 F.3d 362, 372 (2d Cir. 2003) (quoting Schurr v. Austin Galleries of Illinois, Inc., 719 F.2d 571, 576 (2d Cir. 1983)). Thus, "'a mere agreement to agree in which a material term is left for future negotiations is unenforceable.'" Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 95 (2d Cir. 2007) (quoting Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249 (1981)(alterations omitted)). "While there are some instances where a party may agree to be bound to a contract even where a material term is left open . . . , there must be sufficient evidence that both parties intended that arrangement." Express Industries & Terminal Corp. v. New York State Department of Transportation, 93 N.Y.2d 584, 590, 693 N.Y.S.2d 857, 860-61 (1999).

In an e-mail dated December 3, 2004, Mr. Toms outlined an order for four styles of Henry Grethel garments, including fabric specifications and prices. (Pl. Exh. 16). He characterized it as "the initial Spring 2005 loungewear order" and indicated that he

hoped to place additional orders later. The order included a delivery date of January 15, 2005 "x-port Karachi." Had this order been unequivocally accepted by Sara, it might well have constituted a binding contract. See id. at 589, 693 N.Y.S.2d at 860 ("The first step then is to determine whether there is a sufficiently definite order such that its unequivocal acceptance will give rise to an enforceable contract."). But Sara did not accept it.

Mr. Azam responded in an e-mail the same day in which he stated,

> The delivery date you mentioned (Jan 15) is not possible where as I don't yet have the confirmed POs with the details of embroidery and accessories. . . . I am not definite for the delivery date so don't start working on the L/C until I get all the details and then I will advise you what delivery date should be for the project.

(Def. Exh. F). On December 30, Mr. Toms e-mailed an employee at Sara named Mairaj and urged him to "move forward with Sp 05 production, for earliest possible delivery." He noted that Mr. Liu would be available the next week and "L/C and PO will be sent then." (Pl. Exh. 17). However, in an e-mail dated January 4, 2005, Mairaj demurred. He said,

> Re: P.O's / L.C - Please note that today we have worked out the possibility of getting the fabric on the earliest possible time frame but the supplier is still insisting that he cannot complete delivery of the fabric before 2/25 - Also bear in mind there would be eid holidays starting from 21st jan and because of which work will suffer at least one week otherwise the delivery would have been earlier - Please confirm your understanding.

(Pl. Exh. 21). Mr. Toms responded the next day, but did not

"confirm" anything. Instead, he expressed frustration at the inability to agree on a delivery date:

> This "delivery date" conversation on the woven fabric continues to get longer and longer, with ever[y] email. Please try to let me understand that - you will only get the fabric at the earliest 2/25/05, and based on our needed qtys, what do you expect the actual production of garments to be . . . x-factory?

(Pl. Exh. 21). The next day, Mr. Toms e-mailed Mr. Azam and raised a further issue regarding price. He set forth a number of styles, saying "The below outlined order for spring 05, is what we want to place . . . . If this is placed by L/C within the next couple of days, "What is our balance due (in dollars) on the Spring 05 sample invoices totaling $29,610.00 USD?" (Pl. Exh. 18).

This series of communications demonstrates several things. First, no delivery date was ever agreed upon by the parties, though that was clearly a material term. The only delivery date that Sainty was willing to agree to was January 15, a date that Sara acknowledged that it could not meet. Second, Sainty implied its intent not to be bound until it expressed its final agreement by opening a letter of credit, which never occurred. Finally, even though there was a tentative agreement with respect to per unit prices, there was no meeting of the minds on an overall contract price because there was still uncertainty as to the amount of credit Sainty would receive against the sample costs. Accordingly, there was no enforceable contract, and Sara cannot recover on its Third Cause of Action.

Conclusion

For the reasons set forth above, judgment shall be entered in favor of Sara and against Sainty in the amount of $14,692.00 on Sara's Second Cause of Action, together with interest at the rate of nine percent per year, compounded annually, from August 26, 2004 until the date of judgment. Judgment shall also be entered in favor of Sara dismissing Sainty's First and Second Counterclaims.[10] Finally, Judgment shall be entered in favor of Sainty dismissing Sara's First and Third Causes of Action. The Clerk of Court shall enter judgment accordingly and shall close the case.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       August 1, 2008

Copies mailed this date:

Thomas C. C. Sargent, Esq.
Sargent, Sargent & Jacobs, LLC
830 Post Road East
Westport, CT 06880

Michael F. Konopka, Esq.
Law Office of Michael Konopka
277 Broadway, Suite 810
New York, New York 10007

---

[10] Sainty previously withdrew its Third Counterclaim for trade libel.